### EX PARTE JOHN CARR.

1. **Counties** : CRIMES IN UNORGANIZED COUNTIES : VENUE. Under Chap. 10 of the Revised Statutes of 1866, all unorganized counties were attached to the nearest organized county directly east, for election, judicial, and revenue purposes ; therefore, where a murder was alleged to have been committed in the county of Sioux, the party accused of committing the same could not be indicted and tried for the offense in Cheyenne county, it being directly south of Sioux county.

2. **Criminal Law** : LOST INDICTMENT. Where the record of the indictment against a party accused of committing a crime has been omitted or lost or destroyed, the court will receive secondary evidence as to the essential facts stated in the indictment which conferred jurisdiction on the trial court.

HABEAS CORPUS.

*Marquett, Deweese & Hall,* for the writ.

*William Leese, Attorney General, contra.*

MAXWELL, CH. J.

The defendant was indicted in Cheyenne county in the year 1877 for the murder of one William Love, and convicted and sentenced to the penitentiary for life. This is an application for a writ of habeas corpus to discharge him, on the ground that the offense was not committed in Cheyenne county, and that therefore the district court of that county had no jurisdiction. The records of Cheyenne county, without any fault of the relator, fail to show the original or any copy of the indictment, hence we are compelled to rely upon secondary evidence as to the county in which the offense was charged to have been committed. One J. C. Lane, a witness on behalf of Carr, makes the following affidavit:

"STATE OF NEBRASKA, } ss.
    LANCASTER COUNTY.

"J. C. Lane, being duly sworn on his oath, says that he is well acquainted with John Carr, the applicant for a writ of habeas corpus in this case, and has known said Carr since A.D., 1876; that affiant is well acquainted with the proceedings and prosecution of said Carr by the state of Nebraska, for the alleged killing of William Love; that affiant knew the said Carr when the said Carr lived in Cheyenne county, and also while said Carr was confined in the county jail of said Cheyenne county; that this affiant was in Sidney at the time said Carr was indicted, and also at the time he was tried for the alleged killing of one William Love; that affiant well remembers the facts and the circumstances connected with the alleged killing of William Love by the said Carr; that at the time the said killing took place this affiant was in the employ of Major Mayberry, who owned a large amount of cattle in that country, and this affiant was working on the Platte river, at Camp Clark, for the said Major Mayberry, at the time the killing took place; that in the summer following the killing of said Love, affiant was in the employ of said Major Mayberry, and was engaged in gathering cattle over on Snake creek, in the immediate vicinity where the killing took place, and where the body of said Love was buried; that affiant had several times seen the grave where William Love was said to be buried, and it was generally known and understood and spoken of as the grave of said William Love, who was killed by the said John Carr; that affiant has resided in the country above described, to-wit, in about Camp Clark and over on Snake creek, and has traveled through the country both as a freighter and a herder of cattle from the time the said Love was killed until the year 1884, and that affiant is well acquainted with all the country in and about where the said Love was said to be killed; that affiant knows

the line that divides Cheyenne county from the unorganized territory of Sioux, and knows that the grave said to be the grave of William Love is in what was then the unorganized territory of Sioux, and it is understood by everybody in that vicinity that the body was buried by some freighters where it was found; that affiant having been acquainted with the said John Carr, when he learned that he was arrested and indicted for killing a man, interested himself in Carr's behalf to a certain extent, and went to the jail to see Carr, and also saw Carr in the court room at the time he was tried; that affiant was shown the indictment by the said Carr, and affiant read the indictment, and talked over the matter with the said Carr as to how he came to kill the said Love and all the circumstances connected therewith, and where the killing took place, and how he killed him, etc., and this affiant knows the contents of the said indictment, and well remembers that the said indictment charged the said Carr with the killing of one William Love in the unorganized territory of Sioux; that affiant and John McCarty, who was then sheriff of the county, were intimate friends, and affiant was acquainted with the said McCarty a long time, and was with the sheriff and in his office several times, and that affiant and the sheriff were having a conversation in regard to where the killing was done, and the circumstances in connection with the killing, and in connection with the conversation, the sheriff got the indictment and he and this affiant read it over together and talked the matter over at the time, and the affiant is confident that the said indictment charged the said Carr with killing a man by the name of William Love in the unorganized territory of Sioux."

Lane is corroborated substantially by G. B. Moore, W. F. Payne, L. H. Bordwell, Geo. H. Jewett, and Fonce Reins. A letter of V. Bierbower, who was assigned as counsel to defend Carr, is also in the record, from which it appears that Carr is a "Norwegian, and (at that time)

could scarcely speak any English. He could explain nothing, and I remember, we could find no interpreter in the town. I have always thought, and still think, that Carr never deserved that sentence. He was literally railroaded through his trial." Bierbower, therefore, being unable to get at any of the facts in the case from his client, and apparently finding a strong public sentiment against him, advised his client to plead guilty to murder in the second degree, although his client claimed the act was committed in self-defense.

The offense, however, is clearly shown to have been charged to have been committed, and to have actually been committed, in Sioux county, and not in Cheyenne county.

Chapter 10, of the Revised Stat. of 1886, which were in force when this trial took place, provides that, "All unorganized counties shall be attached to the nearest organized county directly east of them for election, judicial, and revenue purposes."

The court will take judicial notice that Sioux county, as it existed at the time of this trial, was directly north of Cheyenne county. The grand jury of Cheyenne county, therefore, and also the district court of that county, had no jurisdiction in the premises. This is not a case where there had been a change of venue, or the court had directed the finding of an indictment in Cheyenne county, if, indeed, it would have had any authority so to do. The prosecution was instituted in Cheyenne county as a matter of right, and was clearly without authority of law. The court thus being without jurisdiction, its judgment is a nullity and is held for nought.

As no prosecution seems to have been instituted against the petitioner in Sioux county, the clerk is directed to notify the proper authorities of that and Box Butte counties of the action of the court herein, and within twenty days from the time of receiving such notice, such authorities can, if they so desire, institute proceedings to prosecute

such charge ; and in case of failure to do so, the petitioner will be discharged from imprisonment.

JUDGMENT ACCORDINGLY.

COBB, J., concurs.

REESE J., dissenting.

I cannot agree to the conclusion reached in this case by the majority of the court, and will briefly give some of my reasons therefor, without elaboration or the citation of authorities.

While I entertain no degree of disrespect for Hon. V. Bierbower, who defended petitioner upon his trial, yet I do not believe an unsworn statement, from him or any other person, in the form of a letter to the present counsel for petitioner, should have any legal weight attached to it, nor should it be considered as evidence in any form. The law provides a method of taking testimony ; that method should be followed. I find among the files in this application a letter from Hon. William Gaslin, who was the presiding judge at the time of the conviction of petitioner, in which he says he does not remember much about the case, and, therefore, has no recollection as to the allegations of the indictment. If letters are to be considered, I am persuaded that if that judge had consigned a person to imprisonment *for life,* upon an indictment alleging the offense to have been committed in a part of the state over which his court had no jurisdiction, he would have remembered it. It would take very strong proof indeed, to convince me that he would have done so, or that Hon. C. J. Dilworth, who was at that time district attorney and present in court, prepared the indictment and conducted the prosecution, and who was shortly afterwards elected to the office of attorney general of the state, would have been a party to any such proceeding.

It is true that affidavits are presented by which it is sought to be established that such were the facts, but those affidavits, if competent evidence at all, were made nearly ten years after the conviction, by men of whose intelligence or probity we know nothing, and some, if not all of whom, are personally friendly to the petitioner. If the solemn adjudications of our courts can be overturned in this way, then it seems to me there is not much "faith and credit" to be given them. Lost indictments may become common, and the courts be besieged with applications for writs of *habeas corpus.* Suppose the authorities of Sioux county should institute a criminal prosecution against petitioner for murder, and pending the proceeding the indictment upon which he was convicted should be found, and it should contain the allegation that the murder was committed in Cheyenne county, with his plea of guilty therein, as shown by the records before us; this would afford a complete bar to any other prosecution, and he would be entitled to his immediate discharge; for, if it was so alleged and thus admittted, it would be wholly immaterial whether the crime was, in fact, committed on the north or south side of the county line.

Again, the record before us shows that the defense of petitioner was conducted by Messrs. Bierbower and Heist, the latter of whom still resides in Sidney. Neither of those men furnishes an affidavit as to the contents of the indictment, nor does Mr. Bierbower, in his letter, state that it was alleged that the crime was committed in the unorganized territory. Now, can it be believed that if petitioner was "railroaded through his trial" on a void indictment, those attorneys, who are of respectable ability, to say the least, would have tamely submitted to any such proceeding without coming to the supreme court and procuring his discharge? I think not.